This case turns on a failure of proof. The previous decision was remanded to consider whether Northgate's HUMIFLOW satisfied the limitation gas having a temperature within 2 degrees of the predetermined temperature, where predetermined temperature meant single temperature point. Therefore LEXION had the burden to prove whether the HUMIFLOW has a single temperature point. Only if so... Didn't Dr. Bourbon give us a data set too that shows it works? Dr. Bourbon gave us two different predetermined temperature points on this remand and LEXION has asked you to decide which one of those predetermined temperature points to select. And quite frankly, neither of those predetermined temperature points is a predetermined temperature point in the NORTHGATE device. What about 37 degrees? 37 degrees is what Dr. Bourbon says is a predetermined temperature point, but he also gives you 36.44 degrees. No, but I thought in your device that the predetermined point was 37 degrees, no? No, Your Honor. In our device, our literature says that we maintain a 9 degree range from 32 degrees to 41 degrees, and that's not a single temperature point. But I believe what you're referring to is an email where one of our engineers says that the 70 degree heater is maintained at 70 degrees to aim for an output of 37 degrees, but that's not a preset temperature point. At the very least, Your Honor, even assuming a 37 degree preset temperature, the test data that Dr. Bourbon provided at 37 degrees fails to show infringement. And we can walk through that test data if you'd like. But isn't that predicated on our adopting your construction of always rather than always sometimes but not always? If you look at it in a sometimes but not always, that's the interpretation of Bell. And under Bell, under Lexion's interpretation of Bell, we would be required to ignore the claim language. Well, firstly, Bell's analysis regarding sometimes but not always, it seems to me reading the case, doesn't reference the specific subject matter, which seems to be your argument about why Bell wouldn't apply here. It seems to be a very broad statement. That's right, Your Honor. Lexion would ask you to make Bell a rule that you apply regardless of the claim language. And with regard to the claim language, when you look at the claim language here, it's clear that you cannot apply Bell in a vacuum. But I guess so. But the question is not, well, I guess the bottom line on the claim language is whether or not it states that it always has to be at this temperature range based on the predetermined temperature, right? Your Honor, I don't believe— I mean, that's your position, that the claim language and the specification compel an always determination. The claim language requires that it needs to be at—it needs—that that limitation needs to be met. And the claim— Always. Yeah, I thought that was your view. Not sometimes. Do you say that claim limitation needs to sometimes be met? Do you agree with that? No, it cannot be met sometimes. But I believe the context of the claim provides more meaning than rather inserting the term always. The claim language says for an endoscopic procedure. Ms. Addy, isn't the only time that there's really a problem with that range is in the startup period? And the spec kind of specifically notes at column nine that upon activation there's going to be this lag time before you get into the range properly. So, with the specification already acknowledging that upon activation you'll—there'll be a lag time, why isn't what Judge Prost is talking about very appropriate? That it isn't always. It's most of the time, but not always. And let me clarify. We would be happy with always, Judge Prost, but I think the claim language is more specific and it says for an endoscopic procedure, always would be fine as well. But the claim language and the specification are specific to the temperature control requirements of the specification. So, where does that lead us? So, if you're backing—if you agree always, well, what's an alternative to always that you would be comfortable with? Well, I think you have to read the claim and you have to give credence to the limitation within two degrees of the predetermined temperature. And you have to— It seems to me, first of all, in our original opinion we looked at footnote four of table one as defining the claim scope. We looked at the first sentence of that footnote four in defining the claim scope. Now it seems to me, as Judge Rader and Judge Prost are suggesting, we have to look at the second sentence for purposes of the construction that we're dealing with here. And the second sentence clearly contemplates that there will be some times when the—there's a departure from the two degree at start up or where there's a change in the flow rate. So it seems to me you have to concede that while it indicates that the temperature shall be maintained within that range, that's not always the case in times of start up or flow rate change. It's not going to be the case. There are going to be some departures from that. No? In the specification, that is the case. And the applicant could have taken those exceptions into consideration when the applicant drafted the claim. For example, the applicant could have had a specific limitation in the claim taking into consideration start up or new gas flow rate demand. The applicant didn't do that. Or the applicant could have drafted dependent claims that specified those times or those limitations. The applicant didn't do that either. Why didn't they accomplish that by language that doesn't say always and then putting it into the specification what they really meant? Why doesn't that get the same result? Because that would be reading out the meaning of the limitation but reading in language from the specification. Or can't we read the language as informing—the language of the written description as informing the language of the claim? There are times when you can do that, but in this case, it doesn't provide any meaningful language to the limitation within two degrees of the predetermined temperature because there's no way to tell when you're going to be within two degrees of the predetermined temperature. As the district court's opinion reflects, under that type of claim construction, the limitation's meaningless because it would be met with a device that provides gas within a broad range of temperatures as long as it falls within the claimed range for a brief period. I think the second sentence of that footnote four suggests that it is to be maintained in general within that limitation, but that you can have departures at start-up and change flow rates. The question is whether the variation here that occurred was at a start-up period or a change flow rate period. I think if you look at the data, you will find that it helps you that the change in temperature at start-up or the change flow rate. So I think you're stuck with footnote four, but that doesn't perhaps necessarily mean that you lose the case. I agree with you, Your Honor. I agree with you, Your Honor, and I agree with you that even under that interpretation, our test data still shows that we do not infringe. I have another problem, I guess another question, beyond the data that Judge Dyke and Judge We start with the claims, and the claim we're looking at is 1180, and that has the 2% predetermined temperature. But if you look at limitation B and C, what they talk about is part of the invention is sensing the temperature of the gas as it exits to determine if it is within the predetermined range. And C says actuating the heating means if the temperature is without the predetermined range. So it seems to me, looking at the reading fairly, the entirety of the claim, it clearly contemplates that there are going to be periods of time where it's outside of the predetermined range. The invention very effectively tries to deal with that, but it's hard for me to just reading the claim 11 in its entirety to not look at this and say, no, everybody clearly contemplates that it's not going to be in the predetermined range for some portions of time. And the claim includes trying to correct that. So I guess, what's your answer to my reading of just the claim suggesting that a fair reading of the claim does not limit you always, or even always with the exception of those two things in the spec, to having a predetermined range? Do you understand what my point is? I believe I do. And I believe I would take you back to the limitation E that says that the gas has to get to the patient, heated and humidified, having a temperature within two degrees of the predetermined temperature. So once it gets to the patient... But what we're looking at in terms of sometimes and always and never or whatever is the procedure in its entirety. We're not just looking at entry, are we? I thought the whole question here was sometimes and not always during the entirety of the procedure, not just the temperature at which the gas enters, right? I'm wrong about that? Maybe I'm wrong. During the procedure... Why don't you read me B and C. Why don't you look at limitations B and C under 11 and tell me what they are intended to... What they contemplate, if not, that sometimes during the procedure the gas is not going to be within the predetermined range. B and C do contemplate turning the heater on when the gas... To heat the gas if necessary. And so... Which is only necessary if sometime during the procedure the gas does not fall within the predetermined range. But during the procedure, the intent of the invention is to get the gas to the patient or as the gas at the predetermined range. But that's a goal. The question is what the claim contemplates in terms of how this is actually going to work. And again, so what's your answer to my read of the claim that suggests that the claim time during the procedure when the gas may not come within the predetermined range. I agree with you that the gas at different parts of the device has to not come within the predetermined range. That's the point of the device to heat and humidify the gas so that it comes within the predetermined range. So are we only looking for purposes of the sometimes and always or whatever it is? Are we only looking at the temperature at which the gas enters? Is that all we're talking about here? Once we are back here on remand, unfortunately, we're at limitation E and we have to look at such that the gas enters the patient within two degrees of the predetermined temperature and thus providing the gas. I'd like to direct your attention to other reasons why you can reverse this case. And if you disagree with us, we believe this case needs to be remanded because we didn't get the opportunity to question Dr. Bourbon on his altered test data, which we believe was improper to begin with in the first place. He didn't alter the test data, he just reinterpreted it, right? He didn't do new testing. That's correct, Your Honor. But I guess I should say he altered the way he interpreted the results of the data. Why is that so terrible? Because it comes in several years after the close of discovery. He came after a remand from us saying they got the claim construction wrong. But the remand didn't have anything to do with the way he altered the test data. The remand had to do with the predetermined temperature, not with the timing in which He was directing himself to the changed claim construction and trying to say that it's still being quenched. I'm having trouble seeing why he shouldn't be able to do that. He altered the test data at specific different points on when he wanted to consider it, which didn't have anything to do with the predetermined temperature, which is what the claim construction on remand has to do with. And still, while we're here, we, still while we're here up on appeal, they haven't picked one predetermined temperature. I'd like to look at Lexion's test results, if that's okay. Lexion discredits its test number two, and it disavows test number two because it says the simulated patient didn't contact the trocar. That's at Red Reef 42, 43, A7550. Northgate asserts test number two shows non-infringement. By contrast, Lexion also admits that the simulated patient in test number one that it relies on warms the trocar. So those readings also aren't accurate. Lexion says, and I quote, as explained by Dr. Bourbon, and this is at Red Reef 43, the gas within the trocar in simulated patient stays at or near the body temperature because the trocar is warmed by the body. So the body warms the trocar, the trocar warms the gas. How do we know if the gas entering the patient is within two degrees of the predetermined temperature? At A57, the patent teaches that the temperature will not lose more than two degrees from the apparatus to the patient. That's at column five, line 30. Yet Bourbon's test data shows a gain of six degrees, for example, in one place. In other places, it shows other gains. That's the 10 flow data in Blue Brief facing page 25. Again, the body warms the trocar, the trocar warms the gas. How do we know if it's satisfying within two degrees of the predetermined temperature when it enters the body? Therefore, Lexion's test number one is faulty. Lexion discredits test number two. So for this reason as well, you can reverse because their test data fails. Would you like to, well actually you've used your, we'll restore your three minutes of rebuttal time and would you add three minutes to Mr. Wood's time as well so we're even?  Thank you, Ms. Eddy. Did I get that right, Mr. Willey? Mr. Willey, yes. Thank you. Thank you, Your Honor. May it please the court, David Willey for Lexion Medical. Do you agree that the second sentence of footnote four, it tells us what the claim means of table one in the specification? No, Your Honor. With respect to defendant's argument, I do not. I agree that it was an appropriate place to look to define the claim when interpreting what a predetermined temperature was in the first appeal, certainly. But there is no time limitation in this claim. There is a temperature range limitation. There is no time limitation in the claim at which that temperature must be met. So you think that footnote, the second sentence does not tell us what the claim is? I think the second sentence does not tell you what the claim means with respect to any issue with respect to time. We certainly... Let's assume hypothetically we reject that and we say footnote four, second sentence, does tell us what the claim means and that what it says is you can maintain it within the range except for periods of startup and change flow rate. Let's suppose that's the interpretation. Okay, you understand what I'm saying? Yes. Okay. Is it not the case, if you look at 14755, that the temperature changes here that occurred outside the range did not occur as the result of a change in the flow rate? 14755. At the bottom there, the flow rate, as I understand it, is in the left-hand column and the temperature is in the third column. The time is in the second, the temperature is in the third. Okay, and I'm just... Is this... Which test? Is this test number one or test number two, Your Honor? This is the one you're currently relying on. Okay, test number one. As I understand, if I'm wrong, correct me, but that's my understanding. Your Honor, I would point out, of course, that the table is just talking about examples and example tests, but to answer the court's question, when proper flow rates are considered, when proper flow rates are considered, I believe the data does reflect that the temperature variations occur due to a change in flow rate. How? Because it seems to me that this shows on its face that the temperature variation outside of the range does not occur as the result of a change in the flow rate. Which particular data? At the bottom of 14755, where the flow rate is a constant 15 there for a while, and yet the temperature goes down below the range that's specified. Well, it goes down to 34.83. Does it go outside of a four degree range? It doesn't? No, no, but stick with my hypothetical. Let's assume that 37 is the predetermined set point that the second sentence of footnote four defines the claim, that it has to be maintained except at times of startup and flow rate change. This data does not show it going below the two degree limit at a time of flow rate change, right? I would have to acknowledge that based upon the page that you just showed me in the data. Can I ask you a more basic question that goes to the line of questioning I had for Ms. Addy? It seems to me the limitation we're talking about is not talking about the flow rate maintained during the entire procedure, temperature maintained during the entire procedure. It seems to me that 11E is speaking only to a particular period of time when the gas enters the patient. Am I wrong about that? No, you are correct that it's not talking about the entire procedure, and that's because during the nature of these procedures, and Dr. Bourbon's declaration explains this, during laparoscopic procedures, the flow stops for a period of time, and what the claim limitation says is flowing the gas into the delivering means. So, the temperature limitation certainly only applies when you're flowing the gas into the delivery means, and it doesn't say that it always applies when you're flowing the gas into the delivery means. And is the, so going back to footnote four, when it says the selected temperature was maintained, is that, were we still talking about the same period while it's flowing into the patient, or is that through the whole procedure? When they talk about maintaining, what? Your Honor, I think it's a reasonable interpretation of footnote four that they're talking about when the gas was flowing into the patient. Okay, all right. It doesn't say one way or the other, but I think that's a reasonable inference to draw. Now, the problem for Northgate, the defendants here, is that the claim construction that the court asked about has been waived. They didn't argue this except for short transient periods in the district court. And they didn't argue in the district court that there was any claim language that supports their construction. And this within argument that they've made on appeal is a new argument on appeal. They never argued during claim construction or during the first trial for a construction of the word within. And Judge Prost, your question. We need one within means within, doesn't it? Doesn't that mean they have to stay within? No, within just simply sets forth the boundaries of the range. And as Judge Prost pointed out, this very claim tells you that within doesn't mean always, because if we look at elements A, B, and C, where we're talking about the temperature within the chamber, we heat to a temperature within a predetermined range. We sense the temperature as it exits to determine if it's within the predetermined range. And then we actuate the heating means if it's without the predetermined range. That tells you two things. First of all, it tells you their argument that a temperature limitation always has to be met is dead wrong. The claim tells you it doesn't always have to be met. Second, it tells you that the word within doesn't mean always when applied to a temperature range. What their argument basically comes down to, since there is no time limitation in the claim, is they want you to read in a limitation to the claim, a time limitation into the claim, based upon a policy argument. You make a good point that they're probably wrong, that always is the wrong construction. But when we look at the second sentence of footnote four, which helps us to understand when there can be a departure, you seem to run away from that. That's the problem I'm having. Well, I'm not running away from it, Your Honor. My point is that there is no time limitation within the claim. If there were a time limitation in the claim, then it may be appropriate to look at that. But this court, on two previous occasions, has rejected reading in limitations into a claim because of some perceived purpose of the claim or that the claim would lead to absurd results. One example is Smith, Klein, Beecham v. Apotex at 403 F. 3rd, 1331. In that case, Judge Posner in the district court had read in a limitation that a chemical compound had to have a commercially significant amount of the compound because otherwise the claim wouldn't fulfill any purpose if it only covered a trace amount. And this court reversed and said that the scope of patent claims can neither be broadened or narrowed based upon abstract policy considerations. But we've got more than abstract policy here. We've got a specification. And in fairness to the other side, they're not relying on policy arguments. They're pointing us to portions of the specification, including if you look at column 4, lines 54 through 60, they talk about not a policy goal of the invention, but an important feature of the present invention is that blah, blah, blah, the gas reaches the patient within 2%. So we're bound by the spec as well. And I don't think the import of this statement is sometimes. I think this says it's important to the invention that the gas reach the patient within a predetermined temperature. It was also true in Smith, Klein that there were statements in the specification that what the purpose of the invention... Leaving aside Smith, Klein for a moment. Why can't we fairly read this as being that this is what virtually always... We all agree that always may be a problem, but at least more than sometimes. It doesn't say important features of the present invention is that it sometimes reaches. I mean, you would have us put in the term sometimes, and I don't think that's a fair reading of what the sentence says. I wouldn't have the court put anything into the claim or into the specification. The specification says it's a goal to get within that temperature range. It doesn't say how often. Well, it doesn't say... I don't think it uses the word goal here. It says a feature. There's a difference between a goal and a feature. A feature is something that it does. A goal is something that it strives to do. This statement is talking about what it does, not what it strives to do, right? I think it's talking about what it strives to do. It's talking about a goal or an objective. There are several statements in the specification that it's a goal or objective. Suppose there's a one-hour operation, okay? And for 15 seconds of the operation... All right, flipping the facts here. For 15 seconds of the operation, it's within the range. Does that infringe? And the rest of the time, it's outside the range. Does that infringe? Yeah, under this court's precedent, it would infringe because there is no time limitation in the claim. Your Honor's question, that's their hypothetical, and that's precisely the analysis in Smith-Klein-Beacham. This court said in Smith-Klein-Beacham, this court has repeatedly stated that a court must construe claims without considering the implications of covering a particular product or process. But would we be achieving the objective of the invention at all in that circumstance? Could you argue to us that they have really practiced the invention if they have failed to practice the invention 99% of the time? The invention is more than the temperature range. The invention is delivering heated and humidified gas with a heater and humidifier within about 10 inches of the patient, immediately adjacent to the patient. Yes, and within a temperature range. And if they have failed consistently to do that 99% of the time, can you argue to me that they have achieved what was invented? Well, if it has no effect on the patient, they wouldn't achieve what's invented. But there's no requirement that a claim has to be construed to achieve all of the objectives that are set forth in the specification. Well, I would also think that maybe, so tell me if you agree, that one of the responses to Judge Dyke's question might be that if you look at the invention, I mean, they have to meet all of these limitations. And it seems to me, if somebody is infringing, they also have to have this way of sensing that the temperature is not in the predetermined and doing something to fix it. So that as a practical matter, we're not taught, there's no way that somebody that does it 1% of the time, I can foresee as a practical matter, is going to meet all of the limit, that system is going to meet all, that method is going to meet the other limitations. Because the other limitations consist of fixing it if it doesn't. Yes, Your Honor. Am I right about that? Yes, Your Honor. And the second practical matter here in addition to what... So that the answer to his question is no, that would not infringe because you'd fail under paragraph C. You would not have compensated to get it back within the range, right? It may be possible that you satisfy C and don't satisfy E. But as a practical matter, these are devices approved by the FDA. I don't think there's any practical possibility... Well, we're not talking about practical matter, we're talking about what infringes here. And it seems to me like in Judge Dyke's hypothetical, there would not be infringement because you would have failed either to stay within the temperature range or to compensate under paragraph C to get it within the temperature range. It's possible that you could fail C or you could fail C or E. It seems to me that part of the tension here seems to be with the choice between always and sometimes but not always. Do you think a fairer construction would be something between that? That you do it substantially all of the time but not... I mean, that seems to be what we're struggling with. The answer is no. And I think the second case I was going to mention, the Northern Telecom versus Samsung Electronics case at 215F3R1281 answers that question. That was a method of semiconductor processing. The invention was using a way to remove aluminum off the surface of a silicon wafer. And Samsung argued on appeal that the court should read in a quantity limitation as to how much aluminum should be etched. And this court said there is no quantity limitation in the claim. And even though the goal of the invention was to make very thin lines of aluminum when etching the silicon wafer, the prior art it was fat and now you wanted to make these lines thinner. So you could make smaller semiconductor devices. Even though that was the goal of the invention, there was no quantity limitation in the claim. And Samsung said, well, that's absurd. That would mean trace amounts of aluminum would infringe. And this court nevertheless said it would be improper to read a quantity limitation in the claim. Did that case also include language in the specification that talks about not the goals of the invention but the important features of the present invention? That case did not. But certainly the Rambus versus Infineon case, which we cite in our brief, had language about important features of the present invention. But there was contrary language elsewhere in the specification. Well, where's the contrary language in the specification to this provision that I cited to you in column four? Where's the contrary language? Well, the footnote to column 11 that we've already discussed, there's also language in column nine, starting at about line 47, which we cite in our brief. And there's also language at column nine, line 28, which says that... Wait a minute, so just to be clear, line nine is the lag time in milliseconds for sensing, right? Well, I think you need to go all the way down to line 55. This is talking about there being a lag time for sensing, that that's beneficial to have a fast one, but then it says the first 12 to 15 cc's of gas leaving the apparatus after it's activated are cooler than the predetermined temperature. But that language also is talking about changes as a result of activation or change in flow rate, right? That's true, that's true. The passage further up in column nine says that you maintain the desired temperature at least within about two degrees C of it. So that's an acknowledgment that the temperature may sometimes be outside the two degree range as well. Where's that language? That was column nine, line 29, maybe 28. It says, well, still maintain at the desired temperature or at least within about two degrees C of it and preferably within about 0.5 degrees C. So these are discussions of the preferred embodiments. We have the examples that are below the table in column 11. Those are not statements about what the invention is. The claim here does not have a time limitation in it. It just has a temperature range limitation in it. Under this court's decisions in Bell, SmithKline, and Northern Telecom, it would be inappropriate to read a time limitation into the claim. Unless the court has further questions, I'll yield the rest. Well, I only have 20 seconds left. Thank you, Mr. Willie. Patty, you have three minutes. Thank you, Your Honors. Thank you for the time. Looking back at column nine, line 50, where the specification refers to milliseconds and comparing that to the amount of time that Dr. Bourbon found that the Northgate device might have been within the four degree range, which was 15 seconds, that's thousands of times greater than the milliseconds described within the patent, even if you accept that the startup time and change of rate flow is within the scope of the claim. And so the 15 seconds is thousands of times greater than the milliseconds that the patent anticipates. In conclusion, if you look at the district court's decision, the district court failed to find facts upon which to base its decision. And under that scenario, you can remand. No predetermined temperature was found. No reliance on which Bourbon's test to use. And no decision on whether Bourbon's new declaration was proper. But even with all those new facts, most of those can be resolved in favor of Northgate. And in that situation, you can reverse. Because even if we assume a 37 degree predetermined temperature, none of Bourbon's test data, either original or altered, shows that the HumaFlo maintains a four degree range for an endoscopic procedure. Under this scenario, reversal is proper with an instruction to enter judgment of non-infringement. No more questions. Thank you. Thank you, Your Honors. We'll go on to Ward versus the Postal Service.